Council, you may proceed. Good morning, Your Honors. My name is Gary Smith. I'm a City Attorney representing the City of Seattle and Seattle Center. With me at the Council table is Gary Smith, another lawyer who has helped on this case. I'd like to reserve, let's say, four minutes for you. You may do so. Just watch your clock. Thank you. I'd like to start today with where Seattle Center started. They had a series of problems that they needed to address. One of those problems was, unique to street performers, it was the problem of street performers getting into territorial disputes over the best spots on campus. Those disputes took many forms. Sometimes it was, I was here first, you have to go somewhere else. Sometimes it was, you're setting up too close to me, your crowd is bothering me, your performance is bothering me. Three to four of those kinds of complaints per week. Can you tell me what the permit requirement has to do with any of that? The permit requirement is really different than most permit requirements are. Normally a permit requirement is for, if you're engaged once in a particular activity, you have to come in and get a permit. You're going to have a parade or something. This is a different kind of situation entirely. It's a permit that's good for the entire year. Okay. And then you can come in any time you want without any prior notice. What does it have to do with the territorial disputes? Well, the permit is part of the overall system in the sense that before there were any permit requirement, there was no way to effectively enforce what rules there were about, for example, the territorial disputes. Because they would come and ask people to move, but they then might not move, and there was no way to enforce that. So the permit system is a way of enforcing all the other rules. For example, if someone violates a rule and refuses to conform to the rules, then they may be subject to a permit. We could just have a permit for everybody who does any speaking on public streets, because they might violate some rules. Well, that's, this is only based on an actual record of demonstrated problems, Your Honor. And so that's why. Is there any case that has approved a permitting system that applies to individuals in public areas, in general? Including all the door-to-door solicitation cases which are not allowed in any case? Well, I think this is a unique set of facts when we're talking about the street performances because of the nature of their whole purpose is to gather a crowd. And so you see, when I first read the briefs, I thought that the permits were telling people which areas they can use. I'm willing to assume, for present purposes, that the division of areas is okay, but I don't see what the permit has to do with it. Well. Because you're not using the permits. The only suggestion that's ever been made in the case law about when permits are appropriate, it's essentially to deal with conflicting usage of public areas, usually in terms of large crowds. This is interesting because there's a circumstance in which perhaps individuals present the same problems, but you're not using the permits for that purpose. Well, the permits come in, for example, in addition to enforcing the rules. Let's say, for example, and this happens sometimes, there'd be a dispute between two performers, and somebody would go to get a security officer, and they'd come back, and the performer's gone. There'd be maybe a complaint from a citizen. They have no way of identifying who it is that's engaged in the permits. But aren't these exactly the kinds of arguments that were made for years in all the door-to-door solicitation cases, none of which has ever been upheld? Well, those are. Well, it appears that the interests are much stronger because people are going to citizens' houses, yet the Supreme Court has been absolutely rigid about the notion that asking people to give permission before they can speak is such an onerous thing that we don't do it in these circumstances simply to identify people, and they've refused. Well, I think I'm back to that this is a unique situation where we're talking about a place with 10 million visitors a year. Most of them are going to and from events. It's a very complicated system in order to manage the flow of all that traffic. So it was the judgment of Seattle Center that in order to be able to have any way to effectively enforce any of the other rules, and we'll assume for a minute, if you'll indulge me, that those other rules are permissible, the only way to have an effective enforcement would be to have some kind of a permanent system. Now, it's a nominal requirement, $5 a year entitles you to perform as many times as you want on any day you want. But what if somebody gets up in the morning and wants to perform and they can't do it? Well, they can come in, and if they haven't ever applied, they can come in and just register. There's no discretion in issuing a permit. It's automatic. They can get it instantaneously on a Sunday morning? Well, whenever there's anybody there, they can get one, yes. So they can't. So if somebody gets up on Sunday morning and says, I want to go perform in Seattle Center, they can't do it. Right. That's the Gene Kelly spontaneous performance example from the district court. Now, what about the Chicago case, Chicago Thomas v. Chicago Park District? Yes. That was a permit case. That's right. Does that help in this analysis or not? Well, yes. I mean, it does in the sense that it holds that a permit is a – is constitutional, a permit system is constitutional as long as it's – But what were they permitting there? They were permitting 50 or more people, weren't they? Yes. Yes. But it's constitutional as long as it meets the test for us. I've heard several times that permitting one or two or five or six people is not a problem. It's not appropriate in general. Unless you had a special reason. Well, I think we do have a special reason here. You haven't explained to me the connection between your permit and your issues. Okay. The purpose of street performance is to gather a crowd. Mm-hmm. Now, if we had a rule and considered that, a rule that said, well, you only need a permit if you have more than a certain number of people gathered, like 15 or 20 or 30 or whatever. But how does that work in practice? You know, somebody sets up and performs, and then when they start to gather the crowd, at that point, then they have to go get a permit? That doesn't make sense. So that's why I decided to have the system where I think it is a fairly minimal burden on the speech in the sense that all you have to do is come in. If you think you're going to want to perform at any time at Seattle Center, come in, give us your name, get your permit, and you're good to go. You can come in any time you want during the daytime hours, not in the middle of the night. But you can come in when the center is open, and you can perform at any of the 16 locations. You don't have to do anything. Well, let's assume that performer A comes in and asks for a permit and receives it. And then three days later is accused of doing something that the city doesn't like in contrary to the terms of the permit. What happens then? Well, it's basically on a complaint basis. So if someone comes in and makes a complaint about a performer, then there's a little process that occurs. They receive perhaps a written statement from the complaining party, then they send a copy of that with the performer and ask him for their response. And then they get that response and make a judgment about what seemed to have occurred or not occurred and decide what appropriate remedy would be, if any. And what? What does the city purport to have the authority to do? Well, they could suspend the permit. And there's only one instance in which the permit was actually suspended for five days. Do you think you could have a similar permit for anybody who wanted to speak in the park about anything? No. Why? I don't. I mean, in your analysis, it's the same. People want to gather crowds. If they're speaking, it's because they want someone to listen to them, so they want to gather crowds. What's the difference? Well, the difference is trying to run it through the narrow tailoring analysis. We have a separate interest here. If we have a problem with performers getting into arguments, this is a unique activity, street performing. First of all, most of the performers come on a regular basis. This is not a one-time thing. They come back every day or often, at least, whenever there's sufficient crowd. So there's that that makes it different. The other thing that makes it different is that there's locations and there's economic competition over those locations, which led to the problems of the dispute. So I think if you look at the interests, which I think are legitimate interests, how do we avoid these disputes? We have a problem three or four times a week with disputes among performers over sites. How do we avoid that problem? And how does that problem get resolved simply by requiring everybody that wants to use one of these 16 spots have a permit and then show up? As I understand it, if you had 20 people who wanted the same spot, 19 of them don't get it because they got there late. That's right. They're first come, first served. So whoever gets there first gets the spot. Then whoever comes next then needs to go to another spot. And the spots are located sufficiently far apart so that they don't interfere with one another. And there doesn't seem to be any, given the number of spots and the fact that there's really not any argument here about the spots not being good spots. I'm willing to assume for present purposes that that's all okay. Sure. Although unusual in itself. But I'm still missing the connection. The other thing I'd like you to address is the so-called captive audience. Sure, I will. I'd be glad to address that. The captive audience rule actually predates these latest set of rules. It's in the original rules from many years ago. And it says that most speech activities, whether it's performance or otherwise, within 30 feet of a captive audience, a captive audience is defined as people who are waiting in line to receive goods or services at the center. So if you're waiting in line to get into the NBA game or you're waiting in line to go to the gym. Now, do you have any case law that supports the notion that people in a public park, a public area, standing in line because they'd like to go someplace are a captive audience in the sense of the very restricted set of rules about when you can limit speech to a captive audience? Well, there's certainly case law that acknowledges the interest, the legitimate interest of protecting a captive audience. But there's no privacy interest here, and there's no ---- No, it's not a privacy interest. It's an interest in being able to get the goods and services you want and not have to choose between leaving the line in order to avoid the speaker. You don't have the same opportunity as you do. Like in the Cal Palace case that Your Honor wrote the decision, the people were walking from the, through the parking lot. I understand, but I'm asking the obvious question. Is there any case law that supports the proposition that people who are in a public area that would otherwise be a public forum and have no particularized interest, unlike in the medical care abortion clinic context, unlike people in their house who are at home in Frisbee, have no particularized privacy interest of any kind are subject to so-called captive audience protections? I don't think there's a case either way on it, Your Honor. Well, there's certainly cases in the suggestion that that's a very narrow category of instances. Yeah, but I think the case is recognized that if the person doesn't have the choice So in your theory, then, what about having a similar rule with regard to people going to work? You have to stay 30 feet away from people who are going to a workplace. No. The reason that ---- Why? Well, because they're going. And they can, if they don't like the speech, they just walk around. This is, these are people who are in a fixed location. One drawer, and people don't want to hear picketers when they're going to work. They'd rather not have people tell them that their workplace is unfair to organize people's workplaces. Sure. I would distinguish that, Your Honor. They can just walk by. This is a situation. You're captive because you can't move. All right. So suppose there are workplaces where sometimes you have to wait in line to get in. Let's take that. Okay. And this workplace is located in a traditional public forum? Yeah, on a street. No, but it takes a while to get in, so. Well, in most instances, an entrance to a workplace is not going to be in a public forum to begin with. It's not? Most places are not open. I mean, out on the sidewalk, outside the building? Right, of course. Well, I think that's distinguishable. That's fact. That's not the situation we have here. This is not a public sidewalk that's in a bustling downtown. I mean, this is located in a special kind of center. Yes, but parks have always been treated as equivalent to streets. I'm sorry. Just streets. Right? Parks have always been treated as equivalent to streets for the limited purpose of deciding what's a public forum. There's no case law to the contrary about that. Okay. Well, I mean, I guess I still would say that I wouldn't concede that you could never have a captive audience rule just apply in any kind of public forum. I wouldn't want to – I don't want to concede that. All right. Then what about the 30 feet? Is there any case law that's – and also, this is sort of a moving target, because as I understand it, if I'm standing 30 feet away from the line, but then the line gets longer, I have to move? Well, the idea is that you're not supposed to be able to involuntarily subject people in the line. Okay. So isn't this like Schenck and Hill where there was a concern about the moving target limitations? In other words, this is not an ascertainable distance. It changes with the audience. Well, when we're talking about the street performers, if you accept the idea that – We're not talking about the street performers. Oh, okay. Because this rule doesn't only apply to street performers. It applies to everybody. Okay. Well, can you repeat the question? Yes. I have a sign up that says, you know, I'm against the war in Iraq, and I'm standing 30 feet from the line – from the back of the line, but then more people get in line. I have to move? Well, if you're just standing there with a sign, I'm not sure you're engaged in the kind of activity that's regulated here anyway. We're talking about speech activities, not just standing with a sign. My understanding is that it covers any form of communication. Am I wrong about that? Well, let's see where – Sorry. The rules are kind of extensive. Street performances. Isn't that the term? No, it's called the captive audience rule, and it is in the general section. It's not in the section about street performers. Are we looking at that solely in the context of Seattle Center, or are we – Yes. Yeah, these rules only apply at Seattle Center. The definition of captive audience is on the R46. And then speech activities includes both political speech and commercial speech. Number four, speech activities. And it has a list of places where there's a place restriction, obviously, in the time, place, and manner analysis. And it says within 30 feet of any captive audience or 30 feet of any building entrance. And you think it doesn't include leafleting? No, you don't need a permit to leaflet. I know you don't need a permit. I'm asking about the so-called captive audience provision. Well, speech activities is defined as political speech and commercial speech. I'm not sure that we thought about that issue, but I don't think that speech by itself necessarily in this context is referring to holding a sign. Leafleting? No, I think we're talking about speaking to an audience that doesn't want to hear the message. So it's okay to stand there with a sign, an obnoxious sign, and that doesn't count? We don't care about the content of the sign, no. And that's not how I read the provision, but if you're stipulating to that, we can. Counsel, you're down to two minutes. You wanted to reserve? I'll reserve then. All right. Thank you. Let me do so. We'll hear from the appellees. Good morning, Your Honors. My name is Eleanor Gorella. I represent Michael Berger. Just on that very last issue, if you note on evidence record 47, speech activities is including political speech and commercial speech. On section 12 of the same page, political speech means verbal and or written communication intended to convey a noncommercial political, religious, or philosophical message, and it includes distributing literature, seeking petition signatures, picketing, demonstrating, or carrying signs. So he's wrong about that. So, in other words, I think you're correct, Your Honor, that if you read the rules, certainly facially, the rules are prohibiting political speech within 30 feet of the so-called captive audiences in this quintessentially traditional forum that we have at the Seattle Center, and I don't want to gloss over that, because our starting point of our analysis relates to a point that the city has conceded, which is that the Seattle Center is a traditional public forum. It is a downtown public park. It was conveyed to the city by the dentist for the use of the public, and it is not only traditionally public park, but the policy of the city is to encourage large gatherings at the park. Indeed, up to 99 people may gather there without any sort of permit or advanced permission. But aren't we focused on the permitting system for Seattle Center, which, as I understand it, is limited to performers? Am I wrong about that? Well, there's two parts of the analysis there. Several of the rules that Mr. Berger has challenged relate only to street performers. Okay. The captive audience rule relates to everyone. Okay. But does he have standing to challenge that, since all he's not giving political speeches, he's doing street performance art? Well, I mean, obviously it's very difficult. The continuum between art to political speech is a very difficult one to distinguish, and the cases hold that you could be reciting poetry such as Jabberwocky, and that is entitled to First Amendment protection. It's very difficult to draw that line. Saying that, the record is uncontested in the record that is part of his performance. Magic Mike specifically addresses children for the most part. He's talking about the importance of education and the importance of reading, and he has other messages of substantial content. But I don't think that the analysis there, I don't really rely on the analysis between performance and speech, because that would essentially contemplate undertaking a content-based analysis, where the officer, whoever is seeking to regulate the performer, would have to go up and listen to what the person is saying and make a determination as to whether this is political or not. Could the city fashion an ordinance which would more specifically deal with constricted areas where there's a narrow passage and there tends to be a crowd that does not move fast, but simply is kind of stuck in a position where, assuming they don't want to hear the message, they're forced to hear the message? How would the city deal with that properly as you analyze the constitutional protections here? Certainly the city has a significant interest in making sure that there isn't such congestion, that people can't pass through the park or get to where they want to go. And, in fact, the city has promulgated moves to address that. There are rules already in the Seattle Municipal Code and in the central rules stating, for example, that no one can stand or block ingress and egress within, I think, 20 or 30 feet of the doors to various stadiums and so forth. So the analysis is, the question is, is what is the city, what is the harm that the city is seeking to avoid? That's where the analysis has to start to determine whether something is narrowly tailored. Well, I gave you an example. I'd like you to address the example directly because there is an analogy here. Your example is with respect to the congestion. How would the city deal with the problem of a constricted area where there are people who are not moving along, they're forced to either wait in line or somehow get stuck in an area where they can't move easily, but they don't want to hear a political statement of any kind? How can the city deal with it? I guess I'm confused by the example, Your Honor, because I can't contemplate a situation in which someone is compelled to stand in line. I mean, people may elect to stand in line. They may elect to attend an event that takes place in a public park. In other words, you're saying that if there is a long line for a very popular event at Seattle Center and people line up many hours in advance and they're waiting, they have to put up with people that want to engage them in some political approach? Absolutely. I believe that if you go to an event or go to a public park and somebody wishes to address you and that address does not amount to the point of being aggressive or harassing or otherwise violative of the rules of conduct that pass constitutional scrutiny, that you are, unfortunately, But you're standing in line to get into the venue, and that's the only reason you're there. If you were walking through the park, you could stand and listen or you could leave. But here, you can't leave because you're here for a different purpose. The city can't deal with that? They're not allowed to under the Constitution? I do not believe that the city can enact a sweeping statement that says you can't get within 30 feet of people. Certainly, there have been cases such as Schenck and Madsen where buffer zones have been tailored for particular situations in order to protect a significant interest. Those were both conjunctive cases where there had been prior abuses by the particular people involved. Then you have Hill, which was an ordinance. Yes. And in Hill, the interests were somewhat different because you had health care. And there was – it did allow some limitations of the kind Judge Scanlon is talking about, but much narrower, because it was 8 feet, it wasn't 30, and it was, as I recall, it was limited to unwelcome speech. And it may have also been – I can't remember this, but I think that there was an issue about the moving target as opposed to the people who were standing still. So if you were standing still, it was okay. They struck down the floating buffer zone. Right. And this is sort of like a floating buffer zone, at least in some ways, because as the line isn't steady, so the person who's speaking may have to move if the line moves. Certainly in a place like Seattle Center where you have people attending basketball games and other high-volume events, it is worth considering the fact that lines are going to grow, and they're going to grow quickly, and it is going to create effectively a floating buffer zone. But you're saying the city can't deal with it. I'm saying that the city has dealt with it by saying, for example, they can and will deal with it by not allowing such things as aggressive panhandling or personal harassment. But, yes, if you're standing in a public park and someone is coming along and wants to address you – No, we're not talking about standing in a public park. That's the clear example, and I have no trouble with it. I'm trying to sort out where the line should be drawn with respect to someone who is not there in the capacity of enjoying the park. The person is stuck because of some other need, such as waiting in line for the box office or until the doors open and what have you. I'm not aware of any case which indicates that because you have entered a traditionally public forum for some other purpose, for example, getting to work or going to a basketball game or attending a rock concert or getting into the aquarium, whatever it is, that all of a sudden the city is entitled to put a sphere, a protective sphere around you to protect you from the messages of people who seek to convey them. Can you explain to me how the 30-foot rule affects your client if we assume for the present purposes that the limitation on areas, which I assume you're going to want to address, is valid with regard to street performers? In other words, how is he – and I just don't know the configuration well enough. I mean, are there instances in which some of the 16 areas in which street performers are allowed would nonetheless run into this captive audience limitation? This is difficult to address because what happens in the Seattle Center is we've got – out of the 87 acres, there are 27 open acres, and crowds move in unpredictable ways. I mean, there are certainly some areas where you can predict that a particular performance spot that has been designated will almost always be a good spot to get. There are certainly some spots that my client advises me nobody ever wants to stand on because they're 50 feet yonder and people aren't going to wander over to, especially without amplification. They're not going to wander over to see what you're doing. And then there are the medium spots where sometimes things work out because there are crowds there. The objection to the spots is that the spots, again, are not narrow and tailored because people up to – groups of up to 99 people have substantially more impact on the park than would a performer with a small crowd have. They can gather wherever they want, and yet the performers attract. So what happens is if you're a performer, and unless you're doing something that's quite spectacular like spinning fire or something, it's very difficult to attract people even 15 feet over to a spot. So we're not alleging that the spots were chosen maliciously or, you know, with the hope of deterring street performance, but the fact is is that street performers by their very nature seek to approach a crowd or go near a crowd. But I still don't understand the answer to my question, which is if we assume for the moment – in other words, I'm trying to see how the two pieces fit together. If – I understand that if we struck down the 16 spots, then the 30 feet would matter. But if we didn't strike down the 16 spots? Oh, I see what you mean. Yeah, if you didn't strike down the 16 spots, I do not know what would happen under these rules if, for example, a line extended to the point of getting within the 30 feet. I would imagine just reading the rules on their face that someone – I suppose a police officer could ask a street performer to move, saying that they're in violation of a different rule. And that's physically possible, given the configurations, which I don't know? I think it is physically possible because there are times when there are events at Seattle Center that are so immense that it's quite possible that one of those locations would come within the ambit of a waiting crowd, potentially, or certainly a densely-packed crowd streaming by on their way to attend an event. Do you have any problem with the first-come, first-served component of this program as infringing upon your client's rights? Well, I understand the problem with the territorial disputes. I mean, this is kind of a traditional dispute that's happened in other settings. On the sidewalks, for example, panhandlers will often have a little bit of elbowing of each other to get a preferred location.  It does seem to me wrong that in a traditional public forum, you are not entitled to convey your message because somebody else is there conveying a message. I think that – But that's inevitable. Two people can't be in one spot. Of course. And that's why we have rules against fighting and so forth. If somebody – or kidnapping or personal restraint. I mean, if someone is already there, then you can't stand in that precise spot. Can you stand nearby? I suppose you can until you get to the point of committing some sort of public disturbance and coming under the disorderly conduct statute. Well, are these 16 spots so location-specific that they can be occupied only by one person at a time? I think some of the spots are allowed – there's a number within the circle that states how many performers might be allowed to be in that area. But I believe that the performers have to stay very near these particular spots or they're wandering off the map, and then they're subject to having a preferred location. Are the spots marked out physically at the locations? I do not know that. I should know that. There's a map, which is in my supplemental record, which shows where the spots are. But you don't know whether physically at Seattle Center whether you can see those spots? You can ask counsel for the city on that. Yes. The problem we have here essentially is with the entire permitting system for the street performers. The permitting system is not narrowly tailored because it does not address the permits. Before you get to the permitting system, I'm trying to sort out where Cuba, K-U-B-A, ends and this situation starts. This is, again, on the captive audience. Would you compare this case to Cuba? Your Honor, you have to tell me about Cuba. It's the cap house case. I don't have that in my notes, I'm sorry. Well, the audience in Cuba could easily avoid the demonstrators at the cap house, whereas here the audience is static, in effect. You're not familiar with Cuba, I gather. Okay. I mean, generally we presume under cases like Frisbee v. Schultz, which the case must have arisen out of, that's a residential picketing case. And the Court said where you have locations where individuals can't really avoid you, there is a concern on the part of the government with respect to being targeted for some kind of demonstration. I thought this was precisely what I was engaging you in about ten minutes ago. And now you seem to be shifting your position. I just, I do not see, I do not actually see the concern. There is some concern, I suppose. Okay. I'll concede that there can be some concern here. But on the other hand, what we have are people who are waiting in lines, lines which move and inevitably go away. I don't see the people, I suppose, as trapped. It seems to me that the 30-foot rule is just simply too broad. All right. I was about to ask that. Suppose the rule were 5 feet. Suppose the rule were 5 feet or 2 feet. Certainly at some point where a person is able to actually communicate the message but not interfere with a person's personal space, get right into their face, at some point between those two points, we have an appropriate measuring distance. Because 30 feet is longer than has been approved. Because it's too, you know, probably too far to be, it's too far to leaflet. It's too far to be heard except speaking quite loudly. Yes. It's too far, any sign would have to be a pretty big one. So we're talking about, you know, more than trivial interference with communication while going beyond personal space. But so you would say a 5-foot rule might be all right? Well, in some of the cases, like in Shanken, Madison, there's this thought that someone should be able to approach and speak to you until you're told to go away, at which point, of course, you're getting to the point of some other violation of city rules. So it seems to me that an appropriate distance would be to allow someone to communicate their message with a speaking voice. But also at the same time, if the city can show a substantial concern with respect to people actually being trapped in line and unable to move and unable to avoid the So another rule might be you can't, once somebody asks you to go away, you have to go away. I mean, move back, at least. Move beyond whatever the limit is. Yeah. I mean, I think the — I mean, those are difficult determinations to make for a court to make, but certainly when someone asks you to go away several times and you don't go away, you're verging on the point of a harassment problem. And that's not acceptable. There was an interesting case that came out of the Ninth Circuit a few months ago. The ACLU — well, yet another trip up the ladder for the ACLU case. Has that case cited in any of the briefs? No. It came out last October. If you'd like us to look at it, would you please leave a gum sheet with the deputy clerk and serve copies on your opponents? Okay. Are you talking about the Nevada case? The Nevada case, right. And the point that was made there, there they were — they were closed off an area of the public streets and prohibited people putting out tables and making political speeches and so forth. And the concern in that case, which I thought was appropriate for this case, was the question of at what point do the courts step in and stop the city from the slow trend towards the privatizing of public areas? Counsel, we'll have a look at that case. Your time has expired. Okay. Thank you. Thank you, Your Honor. We'll hear from the city. You have some reserve time. And there was a question of fact having to do with whether these locations are marked. They are. At the center. Yes. On the sidewalk, there's a plaque or something. And it has a number in the middle of it? It has a — they're designated by letter. So it doesn't say there how many people are allowed, but they know. There is a — there is also a notation that indicates whether — you know, how many performers. Some performers — a single performer is a different situation than two performers that are, you know, throwing fire back and forth from one another. And so there are some locations that are designated as being appropriate for that kind of performance and others that aren't. Is there any record about whether there's ever been an issue of people who wanted to perform and had no space to perform?  In fact, no. The record is quite the contrary. The record is that, uncontested, that the most we ever had was usually five to eight performers at any one time. There's 16 sites. The sites are located — you can look on the supplemental exhibit there, the map — but the sites are located throughout the campus. And there are some that are at least adjacent to every major venue. So there are — there's a site that's near Key Arena for people coming — two, actually, so that's for people coming to events that are there. Mark, if the street performers, as defined, have to be commercial, i.e., what if some group decided to do a civil rights protest by singing We Shall Overcome? Would they be covered? Well, that's the — that's the situation that wasn't anticipated in drafting the rule. I think the rule was intended to cover people who are trying to perform to gather an audience, which the — the situation we had was people performing to gather an audience to ask for donations, buskers, in other words. So I don't believe that situation was intended to be covered by the rule. But as defined, it didn't — it seemed to me to cover anybody who sings, for example. Well — Whether you sing politically or sing apolitically. Right. No, as defined, it does. And I would point out, though, that if you do have — if you do gather a crowd, then the same issues about crowd control management come into play, whether it's a street performance or any other kind of form of expression. If you're gathering a crowd, then there is the issue about where you should be doing that in order to minimize conflict with people coming and going. Thank you, Counsel. Your time has expired. Okay. I — do you want me to answer the question about Cuba? Well, it was directed to your opponent, but I think we're okay. Thank you very much. Thank you. The case just argued will be submitted for decision.
judges: O'scannlain, Berzon, Haddon